1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

- - - - - - - - - - - - - - - - - - - -
                                      )
MICHELE DELUCA, Individually     )
and on Behalf of All Others      )
Similarly Situated,              )
                                 )
        Plaintiff,               )        CIVIL ACTION NO.
                                 )            2:21cv675
   v.                            )
                                 )
INSTADOSE PHARMA CORP. f/k/a     )
MIKROCOZE, INC. and TERRY        )
WILSHIRE,                        )
                                 )
        Defendants.              )
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS
**(Motion Hearing)**

Norfolk, Virginia

August 2, 2023

BEFORE:   THE HONORABLE JAMAR K. WALKER
          United States District Judge

APPEARANCES:

          LEVI & KORSINSKY LLP
          By:  Elizabeth K. Tripodi
                  - and -
          BRAGAR EAGEL & SQUIRE, P.C.
          By:  Lawrence P. Eagel
               Counsel for the Plaintiff


          (No appearance by or on behalf of Defendants
          Instadose Pharma Corp. or Terry Wilshire)

Carol L. Naughton, Official Court Reporter

(Proceedings commenced at 11:02 a.m.)

THE CLERK:  Michele Deluca, et al., vs. Instadose Pharma Corp., et al., in Civil Action 2:21cv675.

Ms. Tripodi, is the plaintiff ready to proceed?

MS. TRIPODI:  Yes, good morning, Your Honor.

THE COURT:  Good morning.

MS. TRIPODI:  May it please the Court. Elizabeth Tripodi of Levi & Korsinsky on behalf of plaintiffs.

Your Honor, with me today is Lawrence Eagel of the firm Bragar Eagel & Squire.  Your Honor has granted his pro hac motion, and with Your Honor's permission, Mr. Eagel will be addressing the Court today.

THE COURT:  All right.  Great.  Thank you.

MS. TRIPODI:  Thank you.

THE CLERK:  And no appearance by or on behalf of defendants Instadose Pharma Corp. or Terry Wilshire.

THE COURT:  Let me take a second to get organized here.

Good morning.

MR. EAGEL:  Good morning, Your Honor.  Would it be okay if I stayed over here as opposed to the podium, or is that better?

THE COURT:  If you could come to the podium, but if you need to go back, that's fine.

Carol L. Naughton, Official Court Reporter

I just want to start by walking a little bit through the Court's understanding of the procedural history in this matter.

So currently before the Court is the plaintiff's Motion for Class Certification and Default Judgment. The Court will note, as Madam Clerk did for the record, that no party on behalf of the defendants is present at today's hearing.

The Complaint in this matter was filed on December 30th, 2021. On August 25, 2022, the clerk entered default as to Instadose Pharma Corp. and Terry Wilshire for failure to file an answer in this action. Wilshire is spelled W-i-l-s-h-i-r-e.

On January 18, 2023, the Honorable Elizabeth Hanes directed the plaintiffs to file a Motion For Default Judgement and accompanying memorandum, which the plaintiffs did on February 28th, 2023, and March 2nd, 2023. The Motion for Default Judgment was unopposed, and the matter was reassigned to this Court on April 13th, 2023.

On June 9th, 2023, the Court ordered supplemental briefing to address the question, among others, of whether the Ontario Securities Commission's, OSC, July 9th, 2021 announcement of fraud charges defeats the plaintiffs' fraud-on-the-market theory. The plaintiffs timely responded to the Court's order.

As a result of the Court's review of all the plaintiffs' pleadings, the Court scheduled a hearing to address the substance of the motion.  Whether to grant a Motion for Default Judgment is a matter for the Court's discretion; however, default judgments are warranted when a defendant fails to appear or participate.

By defaulting, the defendant has admitted to the facts alleged in the Complaint, but the Court must still determine whether the Complaint contains adequate factual material to state a claim to relief that is plausible on its face, which is what brings us here today.

The Complaint in this case alleges two counts, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all defendants and violations of Section 20(a) of the Exchange Act against Mr. Wilshire.

For purposes of today, though, I want to focus primarily on Count I and also on the class certification issue.

The goal here, as I mentioned, is for the Court to determine the sufficiency of the Complaint.  So it will be helpful as we go along if, in response to my questions, whether I ask for it or not, if you could point me to specific paragraphs in the Complaint that you think stand for whatever the proposition is that the Court is inquiring

Carol L. Naughton, Official Court Reporter

5

about.  I just wanted to make sure that we were clear on that point.

In order to prevail under Section 10(b), the plaintiffs must prove that, in connection with the purchase or sale of a security, the defendant made a false statement or omission of material fact with *scienter*, upon which the plaintiffs justifiably relied, that proximately caused the plaintiffs' damages.

Now, as the Court sees it, you've essentially alleged four omissions in the Complaint:  first, that the OSC charges against the CEO of Instadose Canada; second, that Instadose had performed inadequate due diligence into the Business Combination and/or ignored significant red flags associated with Instadose Canada; third, that Instadose's internal controls and policies were inadequate to detect and/or prevent impermissible trading activity by control persons of the company; and, fourth, the foregoing subjected Instadose to a heightened risk of regulatory scrutiny and enforcement action.

Does the Court have those four omissions that are alleged in the Complaint correct?

MR. EAGEL:  The Court has, I think, at least what I would say, three out of four.  The issue regarding the disclosure involving the OSC investigation is not alleged throughout to be, sort of, an omission that the plaintiffs

here are relying upon.  So while it is a fact relevant to the factual background of the case, I think we are focusing our attention on that this is primarily, in our view and our advocacy, that this is an omissions case.

This is primarily an omissions case, and the three omissions that Your Honor described are the omissions that we're relying on as we described the factual background.  But I wanted to -- I think the OSC investigation, while relevant, is not a part of the specific omissions that we're alleging and relying on.

THE COURT:  That's helpful.  Thank you.  And I think you preempted in a good way my next question, which was to ask whether this was a case where we have just material omissions or a case where we have a combination of material omissions and then affirmative misrepresentations.  It sounds like you're saying that the plaintiffs view this as a case rooted in omissions.  Is that fair?

MR. EAGEL:  That is correct, Your Honor.

THE COURT:  All right.  So let's turn to the omissions in this case.  I want to start, though, by talking about the July 2021 disclosure, and I know you said that that's not one of the omissions, but I think in the supplemental briefing in response to the Court's questions, one of the things that you argued is that that July 2021 disclosure did not reveal the full extent of the fraud that

allegedly occurred here.

So from your perspective, what information was not revealed in that July 2021 announcement that was eventually revealed in the November 2021 SEC announcement that matters here?

MR. EAGEL:  I think, really, it's -- the principal one, I would say, is the "Instadose had performed inadequate due diligence into the Business Combination and/or ignored significant red flags associated with Instadose Canada."

That would have included, necessarily, due diligence on the chairman of Instadose Pharma; at the time, Mr. Sanders.  And so the fact is that the principal allegation is that -- and it really goes throughout the plaintiffs' Complaint -- is that Instadose had performed inadequate due diligence to -- into the Business Combination and ignored the red flags.

And this is one example.  While a partial disclosure in that, well, this guy, you know, did something wrong, he disputed it, and so it's obvious that the public -- or "obvious" -- I think the trading in the stock would indicate that the public reaction to that disclosure was not material, and, really, the public continued to purchase stock.  As Your Honor is probably aware from the certification, the stock went up to $52 or $55 in early -- I guess it was early November of 2021.

So the stock continued to increase, and there was no indication that the company had not performed the due diligence requirements.

And it also -- one could say that it also supports the argument that at least partially the internal controls and policies at Instadose were inadequate to detect either improper trading activity, although the OSC charges were not trading activity, but Sanders certainly is -- it was alleged that he had misrep- -- or at least misappropriated, I think, personal funds from investors.  So those are the two, Your Honor.

THE COURT:  All right.  And then in that, I guess, SEC announcement, I take it that the line in paragraph 48 regarding "questions and concerns regarding the adequacy and accuracy of information about Instadose," that is, in your view, a reference to the lack of due diligence in this case; even though it obviously doesn't explicitly use the words "due diligence," at least not that I see, that that language is what -- the inference from that is that that's the inadequate due diligence.  Is that fair?

MR. EAGEL:  That's fair.

THE COURT:  Okay.  And from your perspective, the additional information that came forward in the November disclosure, why does that additional information matter as opposed to we now know in July of 2021 that there are these

quasi criminal charges related to an executive of the Canada entity?  Why does that -- the 2021 disclosure, why is that material, the November 2021 disclosure?

MR. EAGEL:  I think in several respects.  The November 2023 [sic], I guess, disclosure refers to both concerns concerning the adequacy of information about the company in the marketplace specifically, significant increases in stock price and share volume supported by the company's -- not supported by -- unsupported by the company's assets and financial information.

So what the SEC is saying and what the public becomes aware of is that the share price is going up and going up quickly and going up without the assets and financial support for that, and so something is happening with the stock that is improper.

That has -- it really doesn't relate necessarily to Sanders or the OSC investigation.  It has to do with somebody is pumping the stock up or improperly trading.  And I think that follows that -- then it says "trading that may be associated with individuals related to a control person of Instadose Pharma."

They don't identify the particular control person, but there is some insider that the SEC has alleged is engaging in, and not only acting alone, but individuals associated with this person are, in effect, engaged in

transactions in trading that ultimately is causing this stock price to rise.

And then, third, the operations of Instadose Pharma's Canadian affiliate, which is -- we interpret that to be Instadose Canada, which is the ultimate subject of the proposed acquisition, and so the overall operations and the fact that there wasn't -- that the information in the marketplace wasn't accurate as to the Canadian subsidiary.

So those are the three, Your Honor.

THE COURT:  I recognize that, in some respects, the plaintiffs are in a bit of a difficult position because there hasn't been discovery, you haven't had the ability to sort of, at least as far as I know, look under the hood here to sort of see, to bolster the factual statements that are outlined in the Complaint.

And so this isn't an effort to play a gotcha game with the plaintiffs, but I think one thing that comes through the Complaint more generally from the Court's perspective is, is it true that you are sort of asking the Court to infer from a host of facts that the U.S. arm of Instadose knew about the criminal charges and knew about the nefarious things that might have been going on in the Canadian entity?

Is that, sort of, at its core that you're asking the Court to infer that from the other facts surrounding the circumstances?  Or do you think that that specific fact is

Carol L. Naughton, Official Court Reporter

pled somewhere?

MR. EAGEL:  Well, I think that fact is pled insofar as you would -- we have alleged that they performed inadequate due diligence, so that's information that they should have known concerning Instadose Canada and that they didn't know and that it was important that they do -- throughout the Complaint, we, I think, state and allege that they were touting this acquisition.

And the reason to tout the acquisition was, in part, to support the increase in the stock price, that they are going to go from a furniture company into, first, a medical pharm company and then they're going to go to a cannabis company.  And they are sort of enticing investors; cannabis, well, that's the new vehicle on the block.

And so that -- and then they pumped it up by saying that -- describing the operations of Canada in the 8-Ks that they admitted concerning the operations of Instadose Canada but not at all describing accurately what the operations of Instadose Canada were and what, in fact, Instadose Canada's results of operations were.  The actual disclosures were -- omitted all the material, or certainly most of the material facts of Instadose Canada.

And so it was a tout -- it was almost a -- you know, let's tout this, let's pump the stock up.  And the SEC to have issued a cease and desist order, you know, shutting down

12

for three weeks -- or two weeks, I guess it was, certainly suggested that the SEC found information to warrant, under the circumstances, a closing of the securities.

And the stock price also reflects -- I mean, it's uncommon for a stock price to go from 22 to 2.  Yes, we see sometimes there's a disclosure about facts that will affect the stock price; but 22 to 2, a 91 percent drop, certainly supports the notion that the public was certainly unaware of any of the facts that the SEC had now described in this release.

And so it is -- getting back to your question, which I think I may have gotten a little aside of, I do think it is -- it is that -- well, I guess the other part of that, before I back up is, Mr. Wilshire, who is -- Defendant Wilshire, he was -- is alleged to have been at Instadose Canada prior to becoming the chief executive officer of Instadose in -- the U.S. Instadose.  And that's alleged in, if you're looking for the paragraph --

THE COURT:  I'm actually glad you brought it up.  I think paragraph 21 is perhaps the one that you're referring to.

MR. EAGEL:  Correct.

THE COURT:  Which says that Mr. Wilshire was "award-winning risk and fraud mitigation manager 'currently responsible for Global Risk assessment and Corporate Social

13

Responsibility at Instadose Pharm Corp.'"  And then it says, "*i.e.*, most likely, Instadose Canada."

MR. EAGEL:  That's correct.  And that's consistent with our obligation to rely on information that we know but information that we're, you know -- we still -- as you said, we hadn't had the benefit of discovery or that information.

So that also supports our allegation that -- the Complaint's allegation that they didn't conduct adequate due diligence and they didn't disclose that they didn't conduct adequate due diligence, that they -- that this was sort of concealed from the investing public.

THE COURT:  So putting a finer point on this, it's not your contention that they did know; it's your contention that they should have known and failed to conduct due diligence slash -- I think you used the phrase "red flags" in that omission as well.  Is that accurate, or do you think it's both?

MR. EAGEL:  On this pleading, I think we allege that they should have known, that they should have performed -- that they performed inadequate due diligence and, therefore, they should have known, and they ignored red flags and, therefore, they should have known, but we do not allege they knew in this pleading as it's currently constructed.

THE COURT:  All right.  Now, what is the basis for the claim that -- I think you've argued that the omissions --

14

and I think you sort of started at the outset of this -- that the three omissions that you reference are separate and apart from the OSC charges against Instadose Canada?  Why is that?

MR. EAGEL:  That the charges are different than Instadose Canada --

THE COURT:  Why is that not -- because, I guess, upon first read, it feels like it is, that the charges are perhaps central to what you're claiming, but now I think what I'm hearing you say is that they are not, that it is just a, sort of, fact that is involved in this case but is not material -- pun intended -- to the claims that you're actually making, correct?

MR. EAGEL:  Well, we think it supports the claims we're making, which is the inadequacy of the due diligence that was performed and the fact that they ignored significant red flags concerning the Instadose Canada, because these are clearly indications of both that -- and due diligence would have done more work to determine -- putting aside just that disclosure itself, that doesn't get into any -- there's no -- they didn't do any further due diligence, as the plaintiff is saying it was an inadequate due diligence, and that they didn't disclose that they didn't do an adequate due diligence, and the same thing is with red flags; they ignored the red flags.

So it's omission in that, really, they are --

Carol L. Naughton, Official Court Reporter

Instadose is not disclosing to the investing public that it is going into this transaction blindfolded, effectively. That's what -- and it's going to ignore everything it sees, and it's going to disregard anything that might come to its attention, but it's going into this transaction, and it's not going to perform due diligence, it's not going to -- and it's not going to conduct an adequate due diligence, which is expected of a public company.  And that's the thrust of the case.

THE COURT:  And the basis of the claim that the due diligence was inadequate, or I think you used the word "abysmal" in the supplemental brief, is that based upon what the SEC had to say in November?  Are there additional facts that you think you've pleaded that suggest that the due diligence was inadequate here?

MR. EAGEL:  I think it is based principally on the revelations that occurred in November of 2021.  I think those are the principal, sort of, revelations that support the allegations that they engaged in, sort of -- ignored red flags and that they didn't perform adequate due diligence and disclose that they weren't performing adequate due diligence.

I think the disclosure concerning the OSC allegation, I think, is supportive, but I don't think that is as critical as what they ultimately disclosed on November 21st.  It's in the face of, again, Instadose

promoting this transaction as being the savior in, sort of, stock price.

THE COURT:  One of the reasons why I'm asking these questions is because, on their face, those allegations that they failed to conduct due diligence or they ignored red flags feel a bit conclusory, and so that's kind of why I'm trying to get at what the substance behind those allegations is so that it's not merely -- you've seen complaints where someone just asserts something, and then there's no support or basis for it.  And while I recognize that the standard is not high when it comes to the Complaint in this stage, I just wanted to get a better sense, and so that is helpful.

We've talked about the due diligence piece.  So let's switch to the red flags a little bit.

Again, is that also sort of rooted in the statement from the SEC, or are there other facts in the Complaint that you view as red flags?  I know you sort of walked through all of these 10-K disclosures that didn't say a whole lot, but beyond the SEC disclosures, is there anything else in the Complaint that you think --

MR. EAGEL:  Well, I do think the OSC allegations is a red flag that certainly would suggest that they didn't perform due diligence and that they didn't perform adequate due diligence.  It supports a red flag.  I think that the principal red flags are certainly what is disclosed by the

17

SEC, you know, in the release.

And effectively, the inadequate due diligence is one of the three, I guess, misrepresent- -- or omissions that we talk about in our case, and I think it goes hand in hand also with Instadose's internal controls and policies being inadequate to protect and/or prevent impermissible trading activity by control persons.

Whether that -- that goes to due diligence, I think the second -- the trading activity -- I know you will see a series of allegations concerning the disclosures relating to related-party transactions, and they are in connection with each, and SOX, Sarbanes-Oxley certifications.

And those are all -- again, those are all disclosures that we're not saying are false disclosures. We're saying what is the falsity is the fact that they didn't disclose that their internal controls and policies were inadequate to detect or prevent impermissible trading activity, which the SEC discovered later.

So while they were touting the fact that they had all these specific related-party transactions, they don't disclose that, in fact, their internal controls were inadequate to detect improper trading.

And that improper trading -- there's no indication that that -- I mean, that that improper trading didn't go on for a certain period of time.  The SEC disclosure

18

announcement doesn't say how long the trading activity -- improper trading activity had gone on. I can say, from my review of the trading in the stock, it's from -- it is from September through, you know, November. Mid-November the stock continues to rise up.

THE COURT: Of 2021?

MR. EAGEL: Of 2021. The stock continues to rise. As I say, it goes up to 20. And then further positive announcements about the Business Combination and the fact that there was a plan of -- that the Plan of Reorganization was approved by the British Columbia court, that ultimately was another disclosure that led to a bump in the price, and then ultimately the price was -- our clients in this case had purchases at $52.

So it was clearly, sort of, a -- I think it was -- they clearly -- Instadose did not have internal controls, or they didn't disclose that they didn't have internal controls and that they didn't have those or that they were inadequate to prevent the improper trading.

THE COURT: I think what you're saying to the Court makes sense with respect to the factual background, but I think it kind of tees up what I think is the core of the concern the Court has with respect to the omissions, which is the *scienter* issue.

So the Supreme Court in *Tellabs, Inc. versus Makor*

Carol L. Naughton, Official Court Reporter

19

*Issues & Rights, Ltd.,* 551 U.S. 308, defines *scienter* as "mental state embracing intent to deceive, manipulate, or defraud."  And it seems like a lot of what I hear you saying is that they didn't detect these issues because their internal controls were bad, but what I don't hear is the pleading of that specific element of it.

And so my question to you is, for each of these omissions that we've talked about, what is the *scienter* that has been pled here that would demonstrate to the Court that the defendants in this case had the "mental state embracing intent to deceive, defraud, or manipulate"?

MR. EAGEL:  Severalfold:  The first I'd say that the inference only has to be as equally as strong as the opposing inference, but the inference in this case is strong.  First, this is a shell company, a small company.  Defendant Wilshire was the president, CEO, and executive, so that it was not a company in which he wouldn't know what was disclosed or what wasn't disclosed.

And the reason that -- the intent here is the reason not to disclose, and what is alleged is they didn't disclose these facts because they wanted to engage in the activity that's occurred and described in the Complaint, and that activity is ultimately to go ahead and close this transaction and get investor support for this transaction without disclosing the real risks of this transaction.

Carol L. Naughton, Official Court Reporter

So what is described is that they wanted to conceal these facts because had these facts been disclosed, then the investing public would not have been so hyped up to the -- sort of the advancement of this new, you know, sort of cannabis company.

So the allegations are specific that, in each instance, they did not disclose this information, they did not disclose these risks and these particular omissions because they wanted to mislead the public, and that's alleged.

And what you are saying, what facts support that, the facts that support that are it is a small company, that these are facts that you would not omit unless you intended to not fully disclose the facts, and the fact that they can be juxtaposed to what was being said concerning the positive aspects of the acquisition.

So I think it is -- the *scienter* is always sort of that hurdle that you have to get over in the pleading, and I think in this case, given the size -- Instadose was a shell company.  So it wasn't an operating business.  It had no operations.  It didn't have employees, didn't have -- so it is, in that instance, a case where management, Defendant Wilshire, was in control, directing the disclosures, directing what should be disclosed, and it is clear -- it is alleged, I mean, that -- we allege that he didn't disclose

21

these facts in order to mislead the public.

And I think there's no other inference -- I think it's equally as strong an inference under this factual pattern that those are the reasons why he didn't disclose it. In fact, I think it's more than equal, but as long as it's equal, I think we comply with *Tellabs* in this small-company and shell-company scenario.

THE COURT:  You can envision a world, though, in which a shell company isn't engaged in nefarious activity, right?  I feel like this is an argument that defense counsel in fraud cases, in criminal cases, make all the time; just because my client had a shell company doesn't mean that it's engaged in nefarious activity, though I think oftentimes the argument is made on the opposite side of it.

So what I hear you saying, it's the combination of it being a shell company and also Mr. Wilshire's knowledge of what was going on at Instadose Canada.

MR. EAGEL:  And also not disclosing the OSC investigation -- the OSC charges in July.  Those charges, I agree, were disclosed by the OSC.  They were publicly disclosed but not by Instadose.  And the reason Instadose didn't disclose those promptly is because there's an intent to conceal and defraud.

You would expect -- we're not arguing that there's -- that that's -- that that fact itself is a fact

Carol L. Naughton, Official Court Reporter

22

that was a misrepresentation, but we are arguing that fact supports the allegation that there was an intent to deceive and defraud, because normally if a significant fact like that came to light, if you were conducting adequate due diligence and disclosing the operations of the company you were looking at and had adequate internal controls, that would be a natural, immediate disclosure for a company.

So it's clear that they were trying to -- well, "clear" -- it is alleged, I'll give you that.  Your Honor, there's no question we've alleged these facts.  I think the Complaint supports it for the reasons I've described.

THE COURT:  And I think this is part of the reason why I asked the question at the outset about the inconsistency or perhaps contradiction here, because on the one hand, it seems to me that we are inferring knowledge about Instadose Canada and its alleged nefarious activities on to the U.S. company in part based upon Mr. Wilshire's relationship with Canada, and he now has a relationship with the U.S.  Is that fair?

MR. EAGEL:  I think in part that's fair, but I think it's also not only that -- that they didn't know, it's more about they should have known.  So I'll -- I do think they probably knew from the facts you've just identified, but what the Complaint alleges is, is that they should have known, that they ignored red flags, that they ignored -- they didn't

Carol L. Naughton, Official Court Reporter

23

perform -- they performed inadequate due diligence.

And one -- so it isn't only -- I think it's more about what they didn't do and what they didn't disclose, not so much what they knew, though I think it's reasonable to infer that they knew more than they disclosed.

THE COURT:  Understood.

All right.  Moving to one of the other elements, which is the reliance issue.  So is it your position that the reliance in this case is based upon the affiliated case law?  It sounds like that is what you're saying, because we're talking about omissions, right?

MR. EAGEL:  That is what we're saying.

THE COURT:  All right.  So what, in your view, is the source of the defendants' duty to disclose?  Is it the fact that it's a company that is trading on the open market?  What's the source of the defendants' duty to disclose?

MR. EAGEL:  Twofold:  One, it's the fact that it's trading on the public markets and these are executives, and the second is that the defendants are disclosing other information, so, by disclosing the fact -- all of the positive information concerning the Business Combination, disclosing all of the related-party transactions.

By disclosing the positive, you're under a duty. You increase your responsibility.  You can't just give the good stuff and not the bad stuff.  And so that's why we say

24

that it's twofold; it's both that it's a public company, but it's also that they actually made affirmative statements that, while true, didn't tell the whole story.  The story that they had to tell is the story we say was omitted.

THE COURT:  All right.  And then the Complaint has this entire section on -- I think it's actually titled.  So it's starting on paragraph 24 and going through paragraph 47, which the section is entitled "Materially False and Misleading Statements Issued During the Class Period," which it's helpful, obviously, for purposes of seeing what your view is on the statements that were issued, but I think the thing, at least that I didn't see when I was reviewing this, is why these omissions are material.

Is that, again, sort of an inference because of the nature of the case?  Or is there something that you think that is specifically pleaded that tells us why these omissions are actually material?

MR. EAGEL:  I think what is -- I think severalfold: One, what is pleaded is what came out in November by the SEC, and so that certainly is something that pleads facts that say these were material, because it's had they effectively warned the public of those facts.

And I think the other reason why it's material is because of the positive statements that they make concerning the Business Combination and concerning the alleged, sort of,

Carol L. Naughton, Official Court Reporter

related-party transactions.  Having given the partial, it makes it material if you start to give half the truth rather than the whole truth.  So I think it's a combination of those two things.

THE COURT:  All right.  Before we pivot to the class certification issue, anything else that you think would be helpful for the Court to know that we haven't covered on the three omissions?

MR. EAGEL:  No.  Let me just check my notes, but I think we've covered them.

What I did want to say, just when Your Honor described the background, I just wanted to say that we have -- also our clients were appointed lead plaintiffs.  I don't know if Your Honor mentioned that, but we are not representing Mr. Deluca here, we're representing Tim Mavis -- I'm sorry, Mavis Brown and Tim Brown, and those were appointed by, I guess, your predecessor on the case as lead plaintiffs, and we were appointed just temporarily -- lead counsel for the class, I guess.  That's part of the background.

THE COURT:  Understood.

MR. EAGEL:  Let me go back to the -- again, I think when you get into the specifics where -- for example, the representation that they had no off-balance sheet arrangements -- and that's a repeated misrepresentation in

26

those paragraphs Your Honor referenced -- and it's that paragraph, and the whole paragraph, that sort of they are making affirmative representations concerning their internal controls, concerning what they do.  And, in fact, they are omitting the most material facts, which is they are not performing the due diligence.  So I think that is principally it, Your Honor.

THE COURT:  All right.  So on the class certification issue, on the face of the claim that you made regarding the requirements of Rule 23, the Court does not have significant concerns with the arguments you have made regarding many of the factors.  I did, however, want to talk to you just about the class period.

So you've submitted to the Court that the class period begins on December 8th, 2020, which is the day after the announcement about the sale -- or the intent to acquire Instadose Canada.  Is that correct?

MR. EAGEL:  That's correct.

THE COURT:  What about the announcement of the sale makes that the actionable period for purposes of the class period?  Because it's the Court's understanding that the class period has to begin from a date that a defendant issues a press release or some statement that begins the dissemination of a continuous stream of false information. So what about that date is why the class period should begin

Carol L. Naughton, Official Court Reporter

there?

MR. EAGEL:  We pegged that date, or that date is pegged because that's the first time of the announcement of the proposed Business Combination.  And since the first omission that we describe is the failure to perform adequate due diligence -- or that they failed to -- they failed to disclose that they had performed inadequate due diligence into the Business Combination and/or red flags, that predates effectively the announcement, in our opinion, as to why we start the class period.  It's that once they made the announcement, they had already had the opportunity to have investigated the Business Combination before they actually entered into the transaction.

THE COURT:  Theoretically.

MR. EAGEL:  Right, theoretically, they should have.

And so that is why we chose that date as the date for the beginning of the class period.  And then we have the subsequent -- I mean, it largely stays -- the subsequent announcements are relying similarly on those kinds of misrepresentations.

The aggressive -- the aggressive -- and one could argue that the class period could be a little later in that period because the aggressive touting of the Business Combination occurs more closely to August of 2021.  I will say that it's after -- certainly that's where they start to

issue, sort of, press releases, 10-Ks, 8-Ks, saying these events had occurred.

However, I think it's fair to say that beginning the class period at the time when they first announced the Business Combination -- and it is consistent throughout -- and then if you go through the February 25th 10-K, they make the same representations concerning -- they don't make any further representations; same omissions.

So they make the same omissions concerning the Business Combination.  They don't describe their inadequate due diligence.  They don't describe the red flags.  So it is -- whatever they've said in December, they have said again in February.  Similarly, in a 10-Q on April 14, 2021, they say the same thing, and they also discuss the related-party transactions that we've talked about before.

So I guess it's really -- we think it's appropriate to start at that period.  And, you know, it's -- often it's not an exact science, but I think this was an event that they should have disclosed what we've said was omitted.

THE COURT:  All right.  So if the Court were to find that the defendant didn't have the requisite *scienter* until -- I know you mentioned August of 2021.  Let's use that because I also noticed, for example, that September of 2021 is when they filed the 8-K that talks about the great benefits that will come from this sale.

Carol L. Naughton, Official Court Reporter

So let's say the Court were to move -- and I'm not suggesting I'm going to do this, but let's say that the Court was going to say that the class period really begins in August or September of 2021 because of those false statements.  What, if any, impact would moving the class period to that window have on the arguments that you've made that support the certification of a class under Rule 23?

MR. EAGEL:  I don't think they would -- I don't think they would adversely affect our arguments in any way.  I think they would be consistent with our arguments.  I think we're -- I just think it would be a shorter class period, might be less damages.  I do think that there is this -- sort of, large transactions later in the class period.

So in terms of the omissions, all of the omissions occurred throughout the class period, as we allege, and so while we think it's appropriate given the consistent omissions for when they described -- again, I'm also including in that the description of the related-party transactions and the failure to disclose the internal -- or the lack of internal controls concerning, really, uncovering the trading.

But it is certainly -- I don't think it would affect the analysis.  It would just shorten the class period.

THE COURT:  So you don't think that it would affect -- I guess let's talk about the numerosity part of it.

30

You don't think that if it were shortened to a few months, that that would affect that part of it?

MR. EAGEL: No, I don't.

THE COURT: All right. Anything else from your perspective on the class period issue?

MR. EAGEL: No.

THE COURT: All right. The Court is going to take a brief recess, and we'll come back, and I'll offer my final thoughts to you.

(Recess from 11:42 a.m. to 11:54 a.m.)

THE COURT: Mr. Eagel, I just have a couple more questions for you on some things we didn't address, the first of which is we didn't really talk about the last omission of the heightened scrutiny that you argue that they were subjected to. Can you just talk me through what your theory is on that specific omission.

MR. EAGEL: I think it flows from the earlier omissions, which is that if you -- having omitted a fact concerning the inadequate due diligence and having omitted the facts concerning their lack of adequate internal controls, those two omissions ultimately lead to the admission that by admitting those facts, you are subjecting yourself to greater regulatory investigation and/or scrutiny, which is enforcement, which I think is -- again, flows a little bit from the November disclosure, the SEC enforcement

Carol L. Naughton, Official Court Reporter

31

proceeding.

I think it's tied to the other two, specifically, because I think it references the other two and, in fact, is intended to mean that that was also a disclosure that should have been in -- it is a -- it is a material omission in that if you don't disclose that you performed inadequate due diligence and if you don't disclose that you lacked internal controls, then you should disclose that the failure to perform the lack of those two activities will subject you to greater scrutiny.

THE COURT:  So if the Court were to determine, again hypothetically, that only one or two of the omissions that you've alleged are actionable, would that have any impact, in your view, on any other aspect of the case?

What, if any, impact would that have if I were to say, hypothetically, that the Complaint sufficiently pleads that there was inadequate due diligence and they ignored red flags but perhaps don't find the others?  What, if any, impact, from your view, would that have?

MR. EAGEL:  I don't think it should change anything. I don't think it would change anything.  I think it would be -- it -- we would still have the same class period; we would still have the same claims.  I think we just -- we would have less omissions.

THE COURT:  All right.  And then on the internal

Carol L. Naughton, Official Court Reporter

32

trading issue -- so I think this touches back on the class period length.  So the way that the omission is worded related to this omission is "Instadose's internal controls and policies were inadequate to detect and/or prevent impermissible trading activity by control persons of the company."

On the preventing impermissible trading activity, I guess what I'm having a hard time understanding is what should they have done to prevent something they would not have necessarily known was happening until it happens?

In other words, the way I read this is the impermissible trading is happening later, like in the late 2021 time period, but it seems like the allegations are that they should have known about that long before or at some point before.  I guess what I'm getting at is, what could or should they have done to know about that?

MR. EAGEL:  I think in the -- we're focused here on internal controls.  They should have had internal -- I mean, they omitted to disclose that they didn't have the internal controls.  And the typical internal controls that would prevent impermissible trading activity is -- Your Honor may be familiar, I'm sure, with, sort of, the idea that you have to get clearance from a general counsel before you can sell or before you can remove a restriction.  These are all -- there's trading periods, windows, where people/insiders can

sell and can't sell.

So it is -- the lack of any internal controls is the issue concerning how they would have prevented impermissible trading.

THE COURT:  And then lastly, on the class period issue as it relates to damages, which I know obviously we didn't talk about today, purposefully, if the Court were to shrink the class period, I assume that that would likely affect the number that is in the damages calculation that you provided in the declaration of -- is it Mr. Bennington, or Benningfield, something like that?

MR. EAGEL:  Yes, Crowninshield is the firm, and Bettencourt is the declarant.

THE COURT:  I thought I was close.  I wasn't sure. I wasn't confident, but I thought I'd take a swing anyway.

I assume that if the Court were to shrink the class period, that that would affect that analysis in some way, right?

MR. EAGEL:  I believe it would.  I just don't -- I would say I believe it would.

THE COURT:  So I'll tell you that if, when the Court issues its order, it decides to shrink the class period, I'll obviously provide you with leave to submit an amended affidavit or declaration as it relates to damages.

But let me also tell you, since we're on the

34

subject, I read that declaration several times, and it is like hieroglyphics.  So to the extent there's a way to simplify the analysis in a situation where we're dealing with a default judgment and the Court just needs to find a basis for the calculation, I want to encourage you to work with the expert to make sure that that is written in a way that is accessible.

MR. EAGEL:  I will do it.  It took me a while to figure out two-trader models and one-trader models and the difference between those two.  We will certainly do that.

THE COURT:  Great.  Thank you.

Anything further from your perspective?

MR. EAGEL:  Nothing, Your Honor.  Just, I guess, on the class period, is the one issue I sense the Court has a little bit of hesitation.  And I wanted to say that it is sort of -- it covers -- the idea is that it was the due diligence throughout the class period that wasn't done and people who bought earlier, while fairly, not confronted with the positive statements concerning the business transaction, I just think -- nonetheless, I think they were all, sort of, brought within that scope.  So that's about it.

THE COURT:  Understood.

I want to thank you both for your time today.  I really appreciate you coming down and arguing your position to the Court, and we will get a response to you in short

Carol L. Naughton, Official Court Reporter

order.  I know this has been hanging around for a while, so I'm sure you will appreciate getting an answer, and we will get you one promptly.

MR. EAGEL:  Thank you, Your Honor.

(Proceedings adjourned at 12:01 p.m.)


CERTIFICATION


   I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



_____/s/_____

Carol L. Naughton

August 8, 2023


Carol L. Naughton, Official Court Reporter